| | | |
|---|---|---|
| **DR. MONA MAHAR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:16-cv-02486** |
| | ) | **CHIEF JUDGE CRENSHAW** |
| **MEHARRY MEDICAL COLLEGE and** | ) | |
| **DR. MEDHAT KALLINY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Dr. Mona Mahar ("Mahar") brought this action against Meharry Medical College ("Meharry") and Dr. Medhat Kalliny ("Kalliny"), pursuant to Title VII of the Civil Rights Act of 1964, the Tennessee Human Rights Act, and Tennessee common law, arising out of Mahar's experience during the first year residency program at Meharry and Meharry's decision not to renew Mahar's residency contract for a second year. (Doc. No. 1-4.) Before the Court is Defendants' Motion for Summary Judgment (Doc. No. 24); Plaintiff's Response in Opposition (Doc. No. 35); Defendants' Reply (Doc. No. 36); Defendants' Statement of Undisputed Material Facts (Doc. No. 26); Plaintiff's Response to Defendants' Statement of Undisputed Material Facts (Doc. No. 35-2); and numerous exhibits. The Motion is ripe for decision. For the following reasons, Defendants' motion will be **GRANTED IN PART AND DENIED IN PART**.

## I.    UNDISPUTED FACTS

### A.    Background

Mahar received her medical degree from Baqai Medical College in 2002. (Doc. No. 27-1 at 8, 128-29.) Mahar did not practice between 2002 and 2014, choosing instead to help out at a family business. (Id. at 128.) In 2012, Mahar was an extern in Meharry's Psychiatry Department,

(id. at 12), and, in 2013, she was a volunteer (id. at 13). In 2014, Meharry hired Mahar as a first year resident in its Department of Family and Community Medicine (the "Department") under a one-year Postgraduate Physician Contract (the "PPC"). (Doc. No. 27-1, Ex. 49.)

The PPC was effective for the term of July 1, 2014 to June 30, 2015. (Id.) In order for Mahar to continue into her second year of residency, the Department had to renew her employment contract. (Doc. No. 27-2 at 38-39.) Renewal of a resident's employment contract is not automatic; rather, it has to be renewed by Meharry based, in part, on evaluations of clinical performance. (Doc. No. 27-1, Ex. 49 at 4.) The PPC provided that the Department's faculty members "shall meet and review the postgraduate physician's evaluations and vote on the disposition of his/her status no later than the last working day of January of each academic year" and that "postgraduate physician shall be notified of the disposition of their status no later than the first working day of March of each academic year." (Id. at 4-5.)

During Mahar's year of residency at Meharry, Dr. Millard Collins was Interim Chair of the Department. (Doc. No. 27-2 at 7-8.) Collins was responsible for operational day-to-day activities of the Department, including overall supervision of the Residency Program. (Id. at 9.) Collins participated in Department meetings discussing resident performance. (Id. at 8.) As of November 1, 2014, Defendant Kalliny was the Associate Residency Program Director, reporting to Dr. Collins.[1] (Doc. No. 27-3 at 6.) In this role, Kalliny directed the day-to-day operations of the Residency Program, assigning Department faculty to residents, directly supervising residents, and working with residents on a daily basis. (Id.)

---

[1] Prior to November 1, 2014, Kalliny had been a member of the core faculty in the Department. (Doc. No. 26-3 at 5.) Kalliny has a medical degree, three master's degrees, and two PhDs. (Doc. No. 27-3 at 5.) He has completed multiple residencies and multiple fellowships in several specialties. (Id.) Currently, Kalliny is an Associate Professor and the Residency Program Director. (Id.)

Kalliny began working with Mahar during her first week of the Residency Program in July 2014. (Id. at 9.) Kalliny would interact with Mahar at least once a week as part of the Residency Program. (Id. at 14.) In addition, Mahar came to Kalliny's office three or four times to discuss her performance. Kalliny and the Department's Residency Program Coordinator, Stephani Glenn, have testified that, for each such meeting, Glenn was present. (Doc. No. 27-3 at 15; Doc. No. 27-4 at 1.)

B.    Mahar's Performance

Mahar's residency included a different rotation each month. (Doc. No. 27-1 at 13-14.) From July through February 2015, Plaintiff participated in rotations external to the Department "core" residency, except for in November 2014. Mahar's evaluations for each of these rotations was generally the same – she performed satisfactorily or above average. (Id. at Exs. 13, 16, 17, 19, 20, 29.)

In November 2014, Plaintiff's rotation was in the Department, and her evaluation by Kalliny listed very low marks across the board.[2] (Id. at 68-70, Ex. 18.) During that same time, Kalliny also conducted Mahar's milestone evaluation, and gave her low marks. (Id. at Ex. 39.) In early 2015, Meharry began to limit the patient procedures Mahar was permitted to perform. (Id. at 73.) When Mahar started her clinical rotations in March 2015, she was told by her supervising Department residents, Drs. Ashley Fields and Cyree Collier, that, in accordance with faculty directives, she would be given only one or two patients per day, and that she was prohibited from admitting or discharging patients, writing any orders, or performing any inpatient procedures. (Id. at 51-52, 55-56, 73, 94-95). On March 16, 2015, Mahar sent Kalliny an email inquiring about

_____

[2] This evaluation was apparently not presented to Mahar for co-signature until the spring of 2015. (Doc. No. 27-2 at 68-70, Ex. 18.)

these limitations. (Id. at 93-94, Ex. 7). The next day, Kalliny confirmed that the limited number of patients Mahar was permitted to see was based on her performance. (Id., Ex. 37). On March 22, 2015, Mahar had a confrontation with Fields and Collier about her restrictions; Kalliny counseled Mahar by email. (Id. at 56-58.) Mahar apologized to Collier and Fields by email in April. (Id., Ex. 9.)

In March 2015, Mahar began receiving a string of very poor evaluations. Mahar's resident advisor, Dr. Jayashee Nathan, gave Mahar low marks in her March 2015 evaluation. (Id. at 71, Ex. 21.) Nathan stated that she "didn't think [Mahar] will be able to care for patient without close supervision." (Id.) Nathan submitted another evaluation in March, again with consistently low marks. (Id. at 73-74, Ex. 23.) Another faculty member in the Department, Dr. Vincent Morelli, submitted an evaluation of Mahar's performance dated March 16, 2015, also giving consistently below average marks. (Id. at 74-76, Ex. 24.) Kalliny's March 2015 evaluation of Mahar stated that she "lacks the fundamentals of medical knowledge and clinical skills. Lacks time management skills. Has been having a hard time to work [sic] as a team member. Lacks proper medical documentations. Lacks proper planning of management plan." (Id., Ex. 25.) Department faculty member Dr. Tamika Pinn's March 2015 evaluation of Mahar concluded that "Dr. Mahar does not demonstrate skills or knowledge in order to be promoted to the 2nd year of Residency." (Id., Ex. 26.) Around this time, Mahar was also criticized for poorly completing patient notes (by Pinn) and not timely completing hospital records (by Kalliny). (Id. at 85, Ex. 27; Id. at 47-48, Ex. 5.)

Following discussions with Mahar about these negative evaluations and that Mahar did not believe she was being evaluated fairly, Collins looked into the evaluations. (Doc. No. 27-2 at 19-21.) Collins concluded that Mahar had problems with basic medical knowledge, communication

and professionalism. (Id.) Collins believed that Mahar's file contained significant documentation indicating a failure to show up for assignments or complete tasks. (Id.) Collins had also developed the opinion that Mahar had difficulty managing patients independently. (Id. at 28.)

C.     The Disciplinary Meeting and Probation

On March 25, 2015, Collins, Kalliny, Pinn, and Glenn met with Mahar to discuss her performance concerns (the "Disciplinary Meeting"). (Doc. No. 27-1 at 41-45.) At the Disciplinary Meeting, Mahar was told "[her] performance was not good." (Id. at 43.) More specifically, the faculty leaders informed Mahar that she lacked performance in the following areas:

> • Clinical skills and knowledge. Dr. Mahar lacks the fundamentals of clinical knowledge and understanding of basics of medicine (Failure of In-Service Exam; score of 200)
> • Poor clinical performance in both inpatient and outpatient settings as determined by core faculty. Dr. Mahar was given the evaluations by Core Faculty that indicated unsatisfactory performance
> • Inability to handle patient number that is appropriate to her level of training
> • Cannot conduct a proper H&P exam
> • Poor concentration during patient care that place[s] patient safety in jeopardy
> • Poor conduct and professionalism
> • Attendance (tardiness and no shows)
> • EMR (notes) deficiencies in both inpatient and outpatient settings
> • Prescription Errors (5 have been identified by Dr. Pinn). Dr. Pinn stated that she spent one (1) hour with Dr. Mahar teaching her to write a pediatric prescription and at this stage in her training she should already know these things
> • Lacks professionalism and her attitude is unacceptable

(Id., Ex. 38.) Mahar refused to accept these criticisms. (Id.) Collins "informed Dr. Mahar that she should listen willingly and with an open mind to constructive criticism." (Id.) Regarding the evaluations of core faculty versus outside faculty, Collins explained to Mahar that:

> [C]ontinuation/promotion in a residency program is ultimately determined by the observations and evaluations by the Core Faculty of her behavior both clinically and professionally i.e. completion of notes, proper triage, interactions with patients, staff and other residents, following directions provided to her by her Attending or supervising senior residents, etc. A good evaluation in various rotations indicates that she passed requirements of a particular rotation, however, satisfactory/good performance in each of the core competency areas shape the total assessment by which the Program Director and core faculty determine her readiness and competency for promotion.

(Id.) Mahar was then informed by Kalliny and Collins that "[i]n looking and listening for patterns they feel Dr. Mahar cannot adequately manage multiple complex patients. She must know basics, complete documentation and know how to write prescriptions." (Id.) Kalliny testified that he felt probation was the only option that remained to improve Mahar's performance. (Doc. No. 27-3 at 20.) Collins testified that "[b]ecause we were close to the time where we had to make critical decisions, we decided to put [Mahar] on a two-month probationary period with specific improvement areas that we wanted to see and that we would be tracking during that time." (Doc. No. 27-2 at 29.)

Collins, Kalliny and Pinn placed Mahar on the two-month probationary period. They informed Mahar that, "based on her performance during the probation period and adherence to the remediation plan, Mahar face[d] 1) possible extension of probation past the June 30th standard promotion date; 2) possibility of repeating [first year] of residency; or 3) termination from residency training in [the Department] @ Meharry." (Doc. No. 27-1, Ex. 38.) They explained that Mahar was "expected to show marked improvement during this two-month probationary period as follows:

• Improve Clinical Knowledge and Clinical Skills (to be assessed by evaluations completed by Core Faculty)
• Charts must be completed within 24 hours (to be assessed by proof of documentation)
• Must demonstrate Ability to handle an appropriate number of patients
• Work cooperatively and professionally as a team member
• Improve Attendance (Tardiness and Absenteeism)
• Must undergo counseling and show proof of such. A professional assessment and/or recommendation will be required from the Counselor at end of probationary period.

(Id.) Mahar received a formal letter informing her that she was being placed on probation for two months and memorializing what had been discussed at the Disciplinary Meeting. (Id., Ex. 38.) Mahar signed the letter, noting that she "accept[ed] the terms of my probation and understand the

areas of which I am expected to show improvement." (Id.) During this same time frame, a fellow resident of Mahar, Dr. Isabella Uche, a female, was also placed on probation for a period of two months for deficient performance due to slow completion of records.[3] (Doc. No. 27-2 at 20-21.)

D.    Performance Evaluations While on Probation

Mahar continued to receive negative evaluations. On March 30, 2015, Mahar received another negative evaluation from Pinn, noting that Mahar lacked accountability and would not accept feedback. (Doc. No. 27-1, Ex. 26.) In April 2015, Mahar had an inpatient pediatrics rotation at Vanderbilt University Medical Center ("VUMC"), during which she was supervised by VUMC attending physicians and upper level residents.[4] (Doc. No. 27-1 at 33.) On April 3, 2015, VUMC notified Glenn that Mahar had not shown up for her rotation, had not picked up her parking pass or pager, and could not be contacted through her email address. (Id., Ex. 36.) Glenn forwarded that email to Kalliny, who emailed Mahar. (Id.) Kalliny wrote, in relevant part:

> As you know inpatient pediatrics is a mandatory rotation. You are in violation of the action plan of the disciplinary committee that you agreed upon on 3/25/2015. You need to report to your rotation as soon as possible. At the end of the rotation you need to submit your attendance sheet signed by Vanderbilt attendings and your evaluation forms. A part of your action plan was meeting . . . for counseling. Please update the disciplinary committee with the actions that you have made so far.

(Id.) Mahar responded with a two-page email detailing significant communication issues and disputing that she had not been prepared or present for her VUMC rotation. (Id., Ex. 35.) Kalliny responded formally, chastising Mahar for not being prepared for her rotation or understanding the basics of scheduling. (Id.) Kalliny concluded: "Dr. Mahar, as I, other core faculty, and senior

---

[3] Dr. Uche was later cleared of probation and re-hired for a second year of the Residency Program.
[4] This rotation had been rescheduled for Mahar from January 2015 (when it was completed by her peers) to April 2015 because Mahar had not timely completed her paperwork. (Doc. No. 27-1, Ex. 35.)

residents mentioned many times, you should take responsibility of [sic] your actions instead of looking for excuses and blaming others." (Id.)

On April 30, 2015, Dr. Charlotte Brown, a VUMC attending physician, sent a very negative evaluation of Mahar to Glenn by email. (Id., Ex. 3.) Inter alia, Brown stated that Mahar (1) had a very difficult time presenting information in an organized, concise manner, (2) struggled with making concise and accurate patient assessments, (3) had outdated and inaccurate notes, (4) had a hard time developing differential diagnoses and coming up with plans to assist in management of patients, and (5) did not have "much insight into mistakes or need for growth." (Id.) Brown concluded: "While I find this very difficult to say, I really do not feel that Dr. Mahar is anywhere near the place I would expect at this stage of her intern year. She requires much more supervision than her peers and struggled with all aspects of patient care despite a very small patient load."[5] (Id.) When she received Brown's evaluation, Mahar sought Kalliny's counsel. (Id. at 34-35.) According to Mahar, Kalliny stated: "You deserve it. That's what you have done. You should go back to a college. If I were you, I would not have – have you in the program near – in the future. Go home and study for one year or two or maybe just go to another medical school, finish up your medical school, and then come back, and then I will see if I will accept you or not." (Id. at 35.)

Also on April 30, 2015, VUMC physician Dr. David Johnson evaluated Mahar for the two days he spent working with her at the end of her rotation.[6] (Id., Ex. 30.) Johnson gave Mahar consistently low marks. (Id.) Johnson explained that: "[Mahar] had a difficult time translating

---

[5] Mahar disputes this evaluation because it was made by email as opposed to being on paper. (Doc. No. 27-1 at 35-36.)
[6] Mahar claims, without any support, that someone else signed her name to this evaluation. (Doc. No. 27-1 at 88-89.)

basic knowledge to care for patients. She also functioned more like a medical student, seeing one patient each day instead of a few patients like the rest of the others." (Id.) On May 5, 2015, another VUMC attending physician, Dr. Whitney Browning, completed an evaluation of Mahar with very low marks.[7] (Id., Ex. 31.)  Browning's negative comments included:

> • Limited knowledge made forming differentials difficult and extremely limited, data analysis was quite poor and often inaccurate
> • Poor ability to apply the knowledge she had to patient management
> • Presentations were unorganized
> • I feel like Mona's performance was well, well below where I would expect an intern to be. Her ability to report and analyze data and develop a reasonable assessment and plan were [sic] extremely poor. I would not feel comfortable at all with her as a supervising resident
> • [Mahar] has a very, very long way to go before being a practicing physician. Expanding her knowledge has and ability to analyze will be a start, but it is unclear to me if reading and rotations will be enough.

(Id.)

On May 10, 2015, another Vanderbilt physician, Dr. Kris Rehm, evaluated Mahar with the lowest possible marks across the board. (Id., Ex. 33.). He opined that Mahar (1) was "unable to formulate [a] differential," (2) had "poor presentation skills," (3) was "well below the expectations of an intern," (4) was "awkward," (5) "wore sandals to work," (6) had "notes not complete," and (7) "may have been the worst/bottom 5% of residents I have seen from multiple schools." (Id.) When pressed by Mahar by email to give her his "best evaluation," Rehm responded: "I also discussed your performance with 3 of my partners who also worked with you in April. Unfortunately we are all in agreement that your performance is not at the level we would expect and hope to see from an intern. While we recognize that a family practice intern has not had the same experience as a pediatric intern at this point in the year, we hope you will take our

---

[7] Mahar claims, without any support, that Browning did not actually hand-write this evaluation. (Doc. No. 27-1 at 90.)

constructive criticism to grow as a physician." (Id., Ex. 32.) Rehm asked that this exchange be forwarded to the Residency Program Director. (Id.)

Finally, on May 17, 2015, Dr. Sara Seghezzo, a VUMC resident, emailed Glenn about Mahar. (Id., Ex. 4.) She described Mahar as "extremely unprofessional," stated that "we currently have second year medical students on the wards at Vanderbilt and they are all more enthusiastic, responsible and knowledgeable than [Mahar]," and concluded "I did not feel comfortable filling out an evaluation form as I would have stated that [Mahar] should have not passed the pediatrics rotation." (Id.) Mahar disputed whether VUMC residents had the right to evaluate her. (Id. at 38-40.) Kalliny accepted the evaluation.[8] (Id.)

E.     Follow-Up and Decision to Not Renew Contract

In her own words and precisely as written, on April 19, 2015, Mahar sent an email to Collins, Kalliny, and Glenn, thanking them for their help that states as follows:

> I wanted to update on certain things. i have apologized my seniors Dr. Fields and Dr. Collier, apologized my attendings, Dr. Nathan and Dr. Pinn last week. i have been in touch with Dr. Nathan on Wednesday she being big help as advisory happy to have her and I'm very grateful to her. i seen few interesting cases at Vanderbilt and been doing night calls, admissions, write progress notes every-morning and put orders if needed. i have started to read about antibiotics. today i saw Dr. locked and will meet her again next week. i would like to thank Dr. kalliny, Dr. Collins and Miss Stephani for helping me go through this process.

(Id., Ex. 9.) On May 19, 2015, Collins, Kalliny, Pinn, and Glenn met with Mahar for a follow-up meeting to review her work performance during the two-month probationary period. (Id., Ex. 41.) Minutes of this meeting were recorded by Glenn. (Id.) The minutes reflect that "Collins, Kalliny and Pinn did a review of evaluations that have been submitted for April and May 2015. Kalliny

---

[8] There was an additional negative evaluation in this time frame from Pinn. (Doc. No. 27-1, Ex. 26). However, the dates of the signatures and the "received" stamp on this document are confused and, thus, the court does not rely on it here.

reported his recent phone conversation with the Attending Dr. Charlotte Brown from VU[MC] regarding Dr. Mahar's performance during her last rotation. Dr. Brown called Dr. Kalliny and expressed serious concern regarding Dr. Mahar's medical knowledge and skills and expressed concern that Dr. Mahar could cause harm to patients." (<u>Id</u>. at 1.) The minutes further reflect that:

> The consensus is that each assessment is very similar and therefore deemed by Drs. Collins, Kalliny and Pinn to be valid. Program leadership has agreed on the following areas:
> • Her Clinical performance continues to be unsatisfactory.
> • Dr. Mahar lacks professionalism and her attitude is unacceptable.
> • Consensus of the core faculty is that Mahar is untrainable.

(<u>Id</u>.) Collins posed the question, "should Dr. Mahar be dismissed?" (<u>Id</u>.) In response, Mahar stated that she did not understand the VUMC attending and residents reports that her performance was poor. (<u>Id</u>. at 2.) Mahar felt "picked on" and could not think of anything she could improve other than her computer skills. (<u>Id</u>.) Mahar stated that she was being "unfairly targeted," but offered no reasons why. (<u>Id</u>.) Collins stated that "Dr. Mahar is not receptive to the constructive criticism and attempts to remediate, she is taking everything personal [sic], and continues to say she doesn't know what changed since February and March. In order to promote Dr. Mahar to [second year] we are looking for: 1. Proficiency and mastery of the system[,] 2. Ability to develop accurate assessments[, and] 3. Ability to accurately prescribe medicines." (<u>Id</u>.) Mahar was informed that there was a strong possibility that her contract would not be renewed. The core faculty attendings decided to consider all options and make a final decision as to the outcome of Mahar's probationary status in June 2015. (<u>Id</u>.)

Meharry subsequently decided not to renew Mahar's contract. (Doc. No. 27-1 at 102, Ex. 42.) This decision was agreed to during an in-person meeting by the Department core faculty, including Collins, Kalliny, Pinn, Morelli, and Nathan. (Doc. No. 27-2 at 23-25.) Mahar was informed of this outcome by a letter dated June 9, 2015. (<u>Id</u>.) The letter informed Mahar that she

had "failed to show marked improvement during th[e] 2 month probationary period." (Id., Ex. 42.) On June 24, 2015, despite the fact that Mahar had been already been terminated from the Department Residency Program, Mahar sent an email to Collins and Kalliny, in which she formally resigned from the Department:

> Dear Program Director,
>
> As you may be aware that I am going through very difficult and rough time and facing extreme hard ship and it's resulting in a lot of fear and uncertainty. I'm unable to continue my responsibilities as an intern because of the tremendous stress has been inflicted on me. I am a single mother and that is making my situation more challenging at this time and period of my life. While I'm weighing my legal options based on the unnecessary hardships I have faced during my internship. I feel I've been wronged, been abused and harassed in multiple ways because of my situation and gender. I will defend myself and my career. I tried my best to avoid this situation by working hard and following the recommendations even though they were based on allegations instead of constructive criticism. Letter of termination was delivered to me in a very unprofessional way. I believe I wasn't given fair chance so I could've continued my residency training. My career is in jeopardy at this time and someone will have to answer and he responsible for the wrong doings. I do wish to express that the way this situation was handled reflects poorly on the program and the leadership. I'll make I'm heard and will continue to fight as long as it takes.

(Doc. No. 27-1, Ex. 44.) Notwithstanding this resignation, Mahar submitted an appeal of the decision to not renew her contract, which was denied because it was untimely. (Doc. No. 27-1, Ex. 46.)

F.    Allegations of Harassment by Kalliny

After her termination, Mahar went to the Human Resources Department of Meharry on June 28, 2015 and met with Ms. Ayanna Moore to allege sexual harassment by Kalliny. (Id. at 124-26.) At Moore's direction, Mahar then drafted a ten-page complaint against Kalliny. (Id. at 110-111, Ex. 48.)

In the complaint, Mahar stated that her time in the Department was "close to a death sentence" and that Kalliny "threatened [her] almost every day." (Id., Ex. 48 at 1.) More

specifically, Mahar first accused Kalliny of hugging her one time at a training session in September 2014. (Id. at 18 & Ex. 48 at 1.) Mahar testified in her deposition that, after the hug, Kalliny told her, "If you need anything anytime, regardless of the day and night, just give me a call. I'll be there for you. And just let me know." (Id. at 19.) Mahar testified that she did not report this alleged incident. (Id. at 21.) Mahar also accused Kalliny of inappropriately touching her shoulder/chest, calling her at home in the evening, telling her "he loved her more than a friend," inviting her over for coffee, telling her "if you live alone, you can move in with me in my apartment," and offering her money. (Id. at 25-28, 110-111 & Ex. 48, passim.) Mahar testified that no one heard or saw these encounters and that they took place in Kalliny's office. (Id.) At her deposition, Mahar also claimed that Kalliny offered her "favors from the department" in return for "a sexual contact." (Id. at 106.) Mahar also alleged that two other Meharry doctors, Drs. Alrabadi and Fields, tried to convince her to have intimate relations with Kalliny in return for "tremendous favors." (Id. at 118-120 & Ex. 48 at 2.)

Much of the rest of Mahar's complaint concerned her treatment related to bad evaluations and poor performance. (Id. at 3-8.) Mahar expressed great upset with criticism leveled at her medical skills, with being put on probation, and with being terminated. (Id.) However, Mahar's complaint to Meharry concluded, in significant part:

> I felt miserable that time very miserable they insulted me front of my parents and I knew I'm not wrong, I haven't don't it. I can prove it. I felt dead inside. Just because I'm single mother, dr. kalliny can traumatize me and make me sleep with him NO I will never do that no matter what. I am a human what if I had an accident, or end up in ICU because of chronic disease. He never thought about 4 year old kid. Whose father is alcoholic everyone knows including; Dr. Ali, Dr. Jabeen, Dr. Nathan, Dr. Pinn, Dr. Kalliny and Dr. Collins. Dr. Kalliny left nothing to destroy my life completely from this earth. Who was going to be responsible for that? These allegation and constructive criticism everything was part of game to make me sleep with him. When he saw she is not going to do it no matter what. He was punishing me by destroying my career. He planned well to vanish one happy family. Is he God? He is destroying my son life before he grow up and become

physician like his mother. My son will die without me. MY SON WILL DIE WITHOUT ME who going to be responsible for this? I know no one. He is very cruel person he has no fear of god? We all believe in god, but its only one god with different names. He is not even scared of god. I was going to die soon. He made me feel so miserable that if there was another person at my place have had gone crazy by now and that's what he did to exactly to prove me. I don't know how I took it inside and kept quiet. I always heard that I'm trying to make associate program director Dr. Kalliny and Program Director Dr. Collins and attending Dr. Pinn and Dr. Nathan wrong. I told them I'm trying to prove myself right; things I have not done. I still can prove it. which I did throughout the year I provided evidence every time I was told I have done something every time every step I proved myself but no one listened to me, instead I heard that I'm wasting my time. He always made me suffer. This is not about allegations or criticism it's about MY GENDER and being a SINGLE MOM. . . .

I will always fight for my right. I believe in god, and I will prove his allegation and being wronged, abused and harassed at work. I will tell each and every person at Meharry about his disgusting desires and what he has done to me in 10 months. Otherwise he will keep destroying families. I'm not scared of his threats no more, he always threatened me and said if ever go to inform anyone about Dr. Alrabadi and Dr. Fields asking me for sexual relationship with dr. kalliny and get favors from family medicine department. When I resist for 10 months. What I got is letter of non-renewal of my contract as Postgraduate 2 (PGY2). I will tell everyone what he has done to me. I make sure to tell each and every person at Meharry. I will go to media and disclose his dirty disgusting games he played with me.

(Id., Ex. 48 at 9-10 (scrivener's errors in original).)

Kalliny denies all allegations of Mahar's complaint and deposition testimony. (Doc. No. 27-3, passim.)

Mahar claims that she reported Kalliny's alleged harassment to Collins beginning in November 2014, and that Collins ignored her several times. (Doc. No. 27-1 at 105-07, 125.) Collins testified that he remembers Mahar's complaints were that Kalliny was tough on her. (Doc. No. 27-2 at 17.) Mahar emailed Collins on April 8, 2015, about Kalliny. (Id., Ex. 2) Collins does not remember responding to the email. (Id. at 33.) Mahar testified that she never used the Meharry

compliance line or went to human resources because "Collins stopped me not to do that [sic]."[9] (Doc. No. 27-1 at 107.)

In her deposition, Mahar also stated that that she spoke with Glenn about Kalliny. (Doc. No. 27-1 at 124-25.) Glenn has declared in an affidavit that: "During Dr. Mahar's first and only year of residency in the Department, [Mahar] complained to me that she was not being fairly evaluated across the board and that she felt people were harassing her in asking her to correct her deficiencies." (Doc. No. 27-4 at 2.) Glenn further averred that "[e]ven though Dr. Mahar often sought out my counsel about her performance deficiencies during which she complained about her evaluations, Dr. Mahar did not state or indicate that any act had been made toward her that was sexual in nature by any Meharry faculty member or employee." (Id.)

---

[9] Mahar did not say anything about harassment to Pinn, a female core faculty member and member of the probation committee. (Doc. No. 27-1 at 125.) On April 13, 2015, Mahar wrote to Pinn and said the following:

> Dr. Pinn,
>
> First of all I would like to thank you for help and support. I want to apologize for any inconvenience and sorry if I have hurt you by any argument during meeting I didn't mean to be rude or disrespectful to my attending. in my culture teachers respect means a lot to us I'm sorry again you have helped me a lot during my training. I have always appreciated your help. But I still want your help to overcome my deficiencies and please help me out to go thru this tough process. I need your guidance throughout and help me become successful physician. I want to become a successful and excellent physician. Please tell me from where to start and how? I want to work hard and learn from please please guide me. I would highly appreciate and be grateful to you.
>
> Respectfully,
> Mona

(Id., Ex. 10.)

G.      Post-Complaint Investigation

Meharry conducted an internal investigation and dismissed Mahar's complaint. (Doc. No. 27-5.) Meharry interviewed Mahar, Kalliny, Collins, and Fields.[10] Kalliny, Collins, and Fields denied any involvement in, or being witness to, any of the acts alleged by Mahar. (Id. at 2.) The investigation determined that "Dr. Mahar's allegations were not credible and that no further action with regard to her complaint was warranted." (Id.)

## II.     STANDARD OF REVIEW

In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A motion for summary judgment requires that the Court view the "inferences to be drawn from the underlying facts . . . in light most favorable to the party opposing the motion." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). The opponent, however, has the burden of showing that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.'" Matsushita, 475 U.S. at 587. "The mere existence of a scintilla of evidence in support of plaintiff's position, however,] will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). If the evidence offered by the nonmoving party is "merely colorable," "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. Anderson, 477 U.S. at 479-52. "A genuine dispute between the parties on an issue of

---

[10] Mahar is "without personal knowledge to admit or dispute" whether she herself was interviewed. (Doc. No. 35-2 at ¶ 100.)

material fact must exist to render summary judgment inappropriate." Hill v. White, 190 F.3d 427, 430 (6th Cir. 1999) (citing Anderson, 477 U.S. at 247-49).

## III.  ANALYSIS

Mahar brings the following causes of action under Title VII and the THRA: sex discrimination, sexual harassment/hostile work environment, and retaliation. (Doc. No. 1-4.) Mahar also brings the following causes of action of under Tennessee common law: breach of contract, negligent infliction of emotional distress, and intentional infliction of emotional distress. (Id.) The Defendants move for summary judgment on all claims. (Doc. No. 24.)

### A.  Title VII/THRA[11] Claims Against Kalliny

Title VII provides that "it shall be an unlawful employment practice for an employer" to discriminate on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a). "[A]n individual employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII." Wathen v. Gen Elec. Co., 115 F.3d 400, 405 (6th Cir. 1997); see id. at 405-06 (concluding that, "the legislative history and the case law support the conclusion that Congress did not intend individuals to face liability under the definition of 'employer' it selected for Title VII," and that an individual is not liable under Title VII); Akers v. Alvey, 338 F.3d 491, 499-500 (6th Cir. 2003) (same); see also Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991) ("[I]ndividual capacity suits under Title VII are [ ] inappropriate. The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act."); DeSoto v. Bd. of Parks and Recreation, 64

---

[11] The stated purpose and intent of the THRA is to provide for execution within Tennessee of the policies embodied in the federal civil rights laws. Tenn. Code Ann. § 4–21–101(a)(1); Bennett v. Steiner-Liff Iron & Metal Co., 826 S.W.2d 119, 121 (Tenn. 1992). Accordingly, the analysis of claims under the THRA is the same as the analysis of claims under Title VII. Campbell v. Florida Steel Corp., 919 S.W.2d 26, 31 (Tenn. 1996).

F.Supp.3d 1070, 1084 (M.D. Tenn. 2014) (observing that Title VII does not provide a cause of action against individuals).

Under the PPC, Mahar was employed by Meharry, not Kalliny. (Doc. No. 27-1, Ex. 49.) Accordingly, the Court will grant summary judgment to Kalliny on these individual claims.

**B.**     Title VII/THRA Claims Against Meharry

        (i)     Adverse Action Sex Discrimination Claim

Mahar may establish sex discrimination either by introducing direct or circumstantial evidence of discrimination. Johnson v. Kroger Co., 319 F.3d 858, 864-65 (6th Cir. 2003). Here, Mahar does not have direct evidence that Meharry's failure to renew her residency contract was motivated by discrimination on the basis of sex.[12] In the absence of direct evidence, Mahar's claims may be based on indirect or circumstantial evidence. Under the circumstantial evidence approach, the Court employs the familiar McDonnell Douglas burden-shifting framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Loyd v. St. Joseph Mercy Oakland,

---

[12] Mahar argues that her complaint to Meharry and deposition testimony comprise direct evidence of discrimination. This is unpersuasive. "Direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." DiCarlo v. Potter, 358 F.3d 408, 415 (6th Cir. 2004) (internal quotations omitted). Thus, "the evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [gender], but also that the employer acted on that predisposition." Id. at 415 (quoting Hein v. All Am. Plywood Co., 232 F.3d 482, 488 (6th Cir. 2000)). For example, a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent. Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000). Mahar's evidence clearly requires drawing inferences. See, e.g., Bryant v. Rolling Hills Hosp., LLC, 836 F.Supp.2d 591, 608 (M.D. Tenn. 2011) (testimony about statement that entity was "getting rid of black nurses" was not direct evidence because "to connect [the] statement to adverse actions against the Plaintiffs, the jury would need to infer that [the witness] observed a corporate decision-maker at [defendant] make a statement or commit an act that led her to believe that [defendant] intended to eliminate its black nurses and that [defendant] acted on the alleged intent with respect to the Plaintiffs"). Here, Mahar's evidence would require the jury to infer that Meharry intended to discriminate against women and that it acted upon that alleged intent by firing Mahar simply because she is a woman.

766 F.3d 580, 589 (6th Cir. 2014); Tenn. Code Ann. § 4-21-311(e) (abrogating Gossett v. Tractor Supply Co., 320 S.W.3d 777, 779 (Tenn. 2010) and requiring the continued application of the burden-shifting framework in THRA cases in accordance with prior state common law).

First, Mahar has the burden of stating a prima facie case of sex discrimination by establishing, by a preponderance of the evidence, that: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position she held; and (4) she was replaced by someone outside of her protected class or treated differently from similarly situated, non-protected employees. Id. If she establishes these elements, the burden shifts to the employer to present a legitimate, nondiscriminatory reason for the adverse action. See Griffin v. Finkbeiner, 689 F.3d 584, 592 (6th Cir. 2012). The burden of production then reverts to the plaintiff to show by preponderance of the evidence that the employer's proffered nondiscriminatory reason was pretext. Id. This can be done by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994), overruled on other grounds by Geiger v. Tower Auto., 579 F.3d 614 (6th Cir. 2009).

Meharry concedes the first two prongs of the prima facie case but contends that Mahar cannot make out either of the remaining two prongs. The court finds that there is a jury question as to the third prong – whether Mahar was qualified to remain in the Residency Program. Mahar received multiple months of average to above-average reviews as well as multiple months of quite negative reviews, and it is up to a jury to sort those out. As to the fourth prong, Mahar "must show that a comparable non-protected person was treated better than she was for engaging in the same conduct." Bryant, 836 F.Supp.2d at 610 (citing Mitchell v. Toledo Hosp., 964 F.2d 577,

582-83 (6th Cir. 1992)). However, Mahar has not identified any male first year resident who was treated better than her for engaging in the same conduct. If Mahar means to implicate every male first year resident who was renewed for a second year, she paints with far too broad a brush. A valid "comparable" must be similarly situated in all relevant respects. See Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352-53 (6th Cir. 1998) (explaining how Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796 (6th Cir. 1994), clarified the standard set forth in Mitchell v. Toledo Hosp., 964 F.2d 577 (6th Cir. 1992)). A plaintiff "need not demonstrate an exact correlation with the employee receiving more favorable treatment . . . to be considered 'similarly-situated;'" rather the emphasis is on the relevant aspects. Id. at 352. In this case, Mahar received months of poor reviews from both Meharry and VUMC physicians and was placed on probation. Mahar has identified no male first year resident who received similarly poor reviews or was placed on probation. Cf. Van Winkle v. HM Ins. Grp., Inc., 72 F.Supp.3d 723, 732 (E.D. Ky. 2014) (rejecting comparators where they differed in levels of job underperformance). Indeed, the only other person Mahar identified that was placed on probation was a woman.

Accordingly, Mahar has not made out a prima facie case for sex discrimination and the analysis need go no further. Meharry is entitled to summary judgment on this claim.

(ii)     Hostile Work Environment Claim

An employee may establish her employer violated Title VII by creating a hostile or abusive work environment, if the employee "show[s] that: (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the employer is liable." Randolph v. Ohio Dep't of Youth Servs., 453 F.3d 724, 733 (6th Cir. 2006) (citations omitted). A hostile work environment exists "[w]hen the workplace is permeated

with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citations omitted). Both an objective and subjective test must be met; in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim. Id. at 21-22. Circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted); Knox v. Neaton Auto Prods. Mfg., Inc., 375 F.3d 451, 459-60 (6th Cir. 2004) (noting that crass and offensive behavior may not be enough to trigger liability if it does not unreasonably interfere with an employee's performance). Courts may consider the effect of the incidents on the employee's psychological well-being. Harris, 510 U.S. at 23. Finally, a "basic tenet" of this cause of action is that it is reviewed by the court based on the totality of the circumstances, such that a court must consider the work environment as a whole and all the alleged incidents of harassment by all perpetrators for their cumulative effect. Williams v. Gen. Motors Corp., 187 F.3d 553, 562-63 (6th Cir. 1999).

Here, Mahar's complaint to Meharry and deposition testimony suggest both verbal and physical harassment, not mere offensive utterances. Mahar alleges a poisoned work environment, in which her supervisor essentially drummed her out of a medical career because she would not yield to his advances. Put simply, Mahar formally complained that Kalliny touched her in an

unwanted, sexual way, made advances towards her, invited her to his home multiple times, offered her money for favors, and, when Mahar spurned his advances, began sabotaging her evaluation and probation process. Mahar's sworn deposition testimony mirrors this complaint. If a jury found that Kalliny acted as Mahar alleges, the jury could conclude that such actions were both objectively and subjectively unreasonable. Moreover, if a reasonable jury found Mahar's complaint and testimony credible, it could find that the behavior she complains of was severe or pervasive. Finally, a reasonable jury could conclude that Mahar's deteriorating evaluations over the course of the year are evidence that the alleged hostile work environment unreasonably interfered with Mahar's work performance and affected her psychological well-being. In sum, the Court finds that Mahar has made a prima facie case of a hostile work environment.

Meharry vigorously disputes nearly every aspect of Mahar's complaint and testimony. These factual disputes make summary judgment on this claim doubly inappropriate. Meharry is not excused from answering Mahar's charge simply because the parties disagree about what happened, whether it happened, or whether Meharry has marshalled more witnesses than Mahar: it is for a jury to evaluate competing factual versions of Mahar's experience in the Residency Program. Nor does Meharry prevail at this stage, as it suggests, simply because Mahar continued to interact with Kalliny throughout the 2014-15 year, as a reasonable jury could find that Mahar had no choice but to interact with Kalliny because she was under his control in the Residency Program. Finally, the Court does not find Mahar's evidence at summary judgment to be a "sham," as Meharry suggests. Mahar's deposition testimony is corroborated by the ten-page complaint she made to Meharry; to the degree there are internal inconsistencies in Mahar's allegations, Meharry is certainly free to explore them at trial.

Accordingly, the Court will deny summary judgment on this claim.

(iii)     Retaliation

Title VII retaliation claims supported by circumstantial evidence are also examined using the McDonnell Douglas burden-shifting framework. Fuhr v. Hazel Park Sch. Dist., 710 F.3d 668, 674 (6th Cir. 2013) (citing Spengler v. Worthington Cylinders, 615 F.3d 481, 491 (6th Cir. 2010)). To assert a prima facie case of retaliation, a plaintiff must establish (1) she engaged in protected activity; (2) the exercise of her protected rights was known to the defendant; (3) she experienced an adverse employment action; and (4) there was a causal connection between her protected activity and the adverse employment action. Id. As to the fourth prong, Title VII retaliation claims must be proved according to traditional principles of "but-for causation," i.e., a Title VII retaliation claim "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, —— U.S. ——, 133 S.Ct. 2517, 2533 (2013).

Meharry argues that, according to Kalliny's testimony, he did not learn of Mahar's sexual harassment complaints against him until July 2015, after Mahar's termination. As such, Meharry contends there cannot have been a causal connection between Mahar's protected report of sexual harassment and the decision not to renew her residency contract that was, apparently, driven by Kalliny. However, Mahar has testified that she complained of Kalliny's actions to Collins beginning in November 2014. Collins had ultimate responsibility for the Residency Program, the decision to put Mahar on probation, and the decision to terminate her. Mahar has also testified that Glenn was aware of her complaints before her termination. Under the minimal burden of proof necessary at the stage, the Court can deduce a causal connection between these reports and the handling of Mahar's evaluations, probation, and termination. Mahar has, therefore, made a prima facie case of retaliation.

The burden then shifts to Meharry to articulate a legitimate, nondiscriminatory reason for Mahar's termination. Meharry has clearly done so by adducing evidence of Mahar's negative evaluations.

The burden then shifts back to Mahar to show pretext. "To demonstrate pretext, a plaintiff must show both that the employer's proffered reason was not the real reason for its action, and that the employer's real reason was unlawful." E.E.O.C. v. Ford Motor Co., 782 F.3d 753, 767 (6th Cir. 2015) (emphasis in original); Adamov v. U.S. Bank Nat'l Assoc., 681 F. App'x 473, 480 (6th Cir. 2017) (citing Nassar, 133 S.Ct. at 2534). To avoid summary judgment, then, Mahar must present evidence from which a reasonable jury could find that poor performance was not the real reason that Meharry terminated her, and that unlawful retaliation in fact was. Ford Motor Co., 782 F.3d at 767.

Mahar alleges that she began to complain about Kalliny's behavior to Collins as early as the November to December 2014 timeframe. This is around the time that Kalliny and other Department physicians began severely negatively evaluating Mahar. As discussed earlier, those evaluations have to be reconciled with average and above-average evaluations that Mahar received from outside physicians (as well as, admittedly, with negative evaluations Mahar received from VUMC physicians). But, if a jury found that Meharry's negative evaluations and, thus, the evaluation process that relied upon them, were suspect, that jury could conclude that those evaluations were not the real reason that Meharry terminated Mahar. Moreover, if a jury so found, it could also conclude that unlawful retaliation against Mahar for her complaints about or resistance to Kalliny was the driving force behind Mahar's termination. While a close call, the Court finds that Mahar has raised the appropriate questions of fact and met her burden as to pretext.

Accordingly, the Court will deny summary judgment to Meharry on this claim.

## C.     Breach of Contract Claim Against Meharry

In a breach of contract action, the plaintiff is responsible for proving (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of contract, and (3) damages caused by the breach of contract. BancorpSouth Bank, Inc. v. Hatchel, 223 S.W.3d 223, 227 (Tenn. Ct. App. 2006).

Mahar's argument is not, as Meharry suggests in its opening brief, that she was entitled to renewal of the PPC and was denied that result.[13] Rather, Mahar contends that the breach of contract occurred when she was notified of Meharry's decision as to the non-renewal of her contract in June 2015, despite the fact that the PPC states that residents will be "notified of the disposition of their status no later than the first working day of March of each academic year." (Doc. No. 27-1, Ex. 49 at 4.) Mahar contends that if she had known of this disposition earlier, "she could have sought out other residencies during the latter part of her time at Meharry." (Doc. No. 35-1 at 17.)

This claim is foreclosed by "the established rule in Tennessee that administrative remedies must be exhausted before relief may be sought from the courts." Canady, 811 S.W.2d at 907 (citing Bracey v. Woods, 571 S.W.2d 828 (Tenn. 1978)). The PPC notified Mahar that she had a right to file a grievance in writing within five days of the notification of non-renewal. (Doc No.

---

[13] Indeed, a claim for non-renewal of a one-year contract would fail. See Canady v. Meharry Med. Coll., 811 S.W.2d 902, 906 (Tenn. Ct. App. 1991) ("Plaintiff had no contractual right except for the agreed employment for one year. He had no contract right to renewal or extension of his contract beyond June 30, 1988. Both Meharry and plaintiff were free to contract or not to contract for the 1988–1989 year. The assent of both parties was necessary to create such a renewal contract."); see id. ("It cannot be said that parties to a one year contract expected to pay damages for refusal to renew such contract for an additional year when there was no contractual obligation to do so.").

27-1, Ex. 49.) Mahar filed such a grievance, but did so nine days late. Because Mahar failed to properly exhaust this administrative remedy, her breach of contract claim is foreclosed. <u>See Canady</u>, 811 S.W.2d at 907 (in case involving the non-renewal of a year-long Meharry residency contract, requiring "[a] more temperate approach, including patient pursuit of the administrative process, [which] would have produced a clear decision of the administrative authorities which might have been applied retroactively if favorable to plaintiff").

Accordingly, the Court will grant summary judgment to Meharry on this claim.

D. <u>Negligent Infliction of Emotional Distress and Intentional Infliction of Emotional Distress Claims</u>

Mahar has not responded to the motion for summary judgment on these two claims and, as such, has conceded her opposition. Accordingly, the Court will grant summary judgment to the Defendants on these claims.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. No. 24) will be **GRANTED IN PART AND DENIED IN PART**. The Court will grant summary judgment to (1) Kalliny on all claims and (2) Meharry on all claims except the Title VII and THRA (a) hostile work environment claims and (b) retaliation claims. Kalliny will be dismissed from this action as a defendant.

The Court will enter an appropriate order.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE